Yolanda and Terrence BALLOU, etc., et al., Plaintiffs-Appellees,

Lula Mae LeBlanc, etc., Plaintiff-Appellee Cross-Appellant,

v.

HENRI STUDIOS, INC., et al., Defendants-Appellants Cross-Appellees.

No. 80–1503.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 25, 1981.

Rehearing Denied Nov. 4, 1981.

David J. Kreager, Orgain, Bell & Tucker, Beaumont, Tex., for defendants-appellants cross-appellees.

Ernest Browne, Jr., Beaumont, Tex., for Ballou.

Wendall C. Radford, Beaumont, Tex., for LeBlanc.

Hugh O'Fiel, Beaumont, Tex., for plaintiffs-appellees.

Before INGRAHAM, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

On the afternoon of June 14, 1977, an automobile traveling at approximately fifty miles per hour struck the rear of an eighteen-wheel tractor-trailer which was parked entirely on the right hand shoulder of a curved, divided highway in Beaumont, Texas. The driver of the car, Jesse Ballou, was killed instantly; Ballou's sole passenger, twelve-year-old Leonard Herman Clay, was rendered unconscious upon impact and died two days later. The plaintiffs—Yolanda Ballou and Terrence Ballou, the children of Jesse Ballou, and Lula Mae LeBlanc, the mother of Leonard Herman Clay—filed this diversity suit in Texas federal district court against Appellant Henri Studios, Inc., alleging that the deaths of Jesse Ballou and Leonard Herman Clay were proximately caused by the negligence of Henri Studios' employee, John Woelfel, the driver of the truck. Henri Studios, inter alia, denied that Woelfel's conduct was negligent and asserted that the collision was caused by the negligence of the deceased driver of the car, Jesse Ballou.

Prior to trial, the plaintiffs filed a motion in limine seeking to prevent the introduction at trial of any evidence that Jesse Ballou was intoxicated at the time of the collision. Specifically, the motion in limine sought to exclude the results of a blood alcohol test performed by the Beaumont Regional Crime Laboratory upon a blood sample allegedly taken from the body of Ballou which reflected that his blood contained 0.24% alcohol by weight at the time of his death. On the day the trial of the case began, the district court held a hearing outside the presence of the jury on the issue whether the results of the blood alcohol test should be excluded from evidence at trial. After hearing argument and testimony, the district court sustained the motion in limine and ruled the results of the blood test inadmissible.

At trial, John Woelfel testified that on the morning of the collision, June 14, 1977, he had made a delivery of concrete statuaries to a garden center in Orange, Texas for his employer, Henri Studios. After delivering the statuaries, he set out to Port Arthur, Texas, by way of Interstate 10 West to complete his deliveries. Woelfel took the Port Arthur exit (Highway 69) off Interstate 10 with the intention of continuing on Highway 69 to Port Arthur, but immediately after exiting he experienced accelerator linkage problems which caused a loss of power to his truck. Woelfel drove approximately one-half mile and pulled his truck entirely onto the shoulder of the roadway under an overpass. Woelfel testified that he placed three warning reflectors on the shoulder of the highway behind his vehicle at approximately ten feet, eighty feet and one hundred and eighty feet. Other trial testimony, however, indicated that the third reflector had been placed at either approximately eighty-nine feet or approximately one hundred and three and one-half feet behind the trailer.

While he was waiting for help to arrive and attempting to repair the truck, Woelfel noticed the car driven by Ballou approximately one-quarter of a mile behind his truck driving almost entirely on the shoulder of the highway. Woelfel testified that he watched Ballou's car as it approached his truck and that Ballou did not slow down, change direction, skid or return from the shoulder to the main portion of the highway. Several seconds prior to impact, Woelfel jumped between the tractor and trailer in order to protect himself from injury.

The district court instructed the jury with respect to the Texas law concerning a truck driver's duty to display warning reflectors behind his disabled truck and the distances at which the reflectors are required to be placed. The court also instructed the jury that under Texas law they could award damages to Yolanda and Terrence Ballou only if they found that Jesse Ballou was not more than 50% contributorily negligent. *See* Tex.Rev.Civ.Stat.Ann. art. 2212a (Vernon Supp. 1980) (barring recovery if injured person is more than 50% contributorily negligent). The jury was further instructed that Ballou's negligence could not be imputed to Leonard Herman Clay.

The jury returned a general verdict for the plaintiffs, but found that Henri Studios was 40% negligent and that Jesse Ballou was 60% contributorily negligent. Finding a conflict between the general verdict for the plaintiffs and the jury's finding that Ballou was 60% contributorily negligent, the district court gave the jury additional instructions and resubmitted the case for further deliberation. The jury subsequently returned a verdict for the plaintiffs, awarding damages of $100,000 for Yolanda Ballou, $150,000 for Terrence Ballou and $15,000 for Lula Mae LeBlanc individually. The verdict found Henri Studios 55% negligent and Jesse Ballou 45% contributorily negligent. The jury awarded no damages to Lula Mae LeBlanc as administratrix of

Leonard Herman Clay's estate for Clay's pain and suffering. Since Jesse Ballou's negligence was not attributable to his passenger, the jury's award of $15,000 to LeBlanc was not subject to reduction and judgment was entered based on the jury's verdict. The district court entered judgment for Yolanda and Terrence Ballou after reducing the amount awarded by the jury by 45% based on the jury's finding of the percentage of Ballou's contributory negligence.[1]

Henri Studios raises several issues on appeal, including the trial court's alleged reversible error in excluding the results of the blood alcohol test, refusing to accept the original verdict of the jury, resubmitting the case to the jury in a manner that had the effect of coercing a verdict for the plaintiffs, and giving erroneous instructions on the Texas law concerning the placement of warning reflectors. Henri Studios does not appeal the judgment in favor of Lula Mae LeBlanc individually for the death of Leonard Herman Clay. However, LeBlanc as administratrix of the estate of Leonard Herman Clay cross-appeals, contending the jury's finding of no damages for Clay's pain and suffering is inconsistent with allegedly undisputed testimony that Clay experienced conscious pain. Concluding that the district court erred in excluding the results of the blood alcohol test, we reverse the judgment in favor of Yolanda and Terrence Ballou and remand for a new trial. We affirm, however, the judgment awarding no damages for Clay's pain and suffering.

### The Blood Alcohol Test

#### 1. The Hearing on the Motion in Limine

A proper evaluation of Henri Studios' claim that the district court erred in excluding the results of the blood alcohol test requires a narration of the facts presented and arguments made at the hearing on the motion in limine as well as a statement of the district court's reasons for excluding the test from evidence. As noted above, prior to trial the plaintiffs filed a motion in li-

---

1. The final judgment also included an award to the estates of Ballou and Clay for the stipulated amount of their funeral bills and headstones. Since the parties had previously agreed that the award for Ballou's funeral expenses would be reduced by the percentage of his contributory negligence as found by the jury, 55% of the stipulated total amount was awarded.

mine seeking to exclude at trial any evidence indicating that Jesse Ballou was intoxicated at the time of the collision, and specifically to exclude the results of a blood alcohol test performed upon a sample of blood allegedly taken from Ballou's body. On the first day of the trial, the district court held a hearing on the motion in limine outside the presence of the jury.

At the hearing, the plaintiffs presented two basic arguments for exclusion of the results of the blood test. First, they contended that the results of the blood test were inadmissible because the defense had failed to establish an adequate "chain of custody" for Ballou's body and the blood sample, and had failed to show that adequate precautions had been taken to prevent the possibility of contamination of the blood sample.[2] Second, the plaintiffs sought to refute the results of the blood test through proof that Ballou was not intoxicated at the time of the collision.

To support their claim that Ballou was not intoxicated, the plaintiffs first argued that the blood test was the only evidence of Ballou's intoxication at the time of the collision, noting that none of the persons who had come into contact with Ballou's body had noticed the presence of alcohol about his body. The plaintiffs then called to the stand Mrs. Eula Eisenhower, a registered nurse employed by Dr. Washburn, a Beaumont doctor whose office was located only a short distance from the site of the collision. Mrs. Eisenhower testified that on the afternoon of June 14, 1977, Jesse Ballou came to Dr. Washburn's office, accompanied by Leonard Herman Clay, to have some stitches removed from his hand. She testified that in removing the stitches she was eighteen inches from Ballou's face, and that Ballou did not have alcohol on his breath and did not act intoxicated, and that she was positive that he was not intoxicated. She also stated that due to experience with alcoholism in her family, she was familiar with the smell of alcohol. According to

Mrs. Eisenhower, Ballou left Dr. Washburn's office at 2:30 p. m. The police report of the collision listed the time of the arrival of the officers at the scene of the wreck at 2:40 p. m.; by that time, Ballou's body had already been taken to the hospital. Finally, the plaintiffs introduced a portion of the deposition of Jim Middleton, the chemist who performed the blood alcohol test, in which Middleton testified that it would probably take at least one hour of steady consumption of alcohol in order for a person to reach a blood alcohol level of 0.24%.

In response to the plaintiffs' arguments, Henri Studios outlined the chain of events leading from the removal of Ballou's body from his automobile through the chemists' analysis of one of the samples of his blood, describing in some detail the chain of custody of Ballou's body and the blood samples. In addition, counsel outlined the procedures pursuant to which the blood samples were labeled and one of the samples analyzed by the chemist. Finally, the defendant noted the chemists' deposition testimony that the test results indicated Ballou was grossly intoxicated at the time of the collision and that such a level of intoxication would greatly impede Ballou's ability to drive his car safely.

After hearing the foregoing arguments and testimony, the district judge sustained the motion in limine. The court gave the following reasons for granting the motion:

> The Court does not feel that the tests [sic] were made with sufficient reliability, that it can be offered, especially in view of all of the argument made by both counsel, which is absolutely unnecessary and superfluous as far as this hearing is concerned. It just irritates the Court to hear attorneys argue matters on a Motion when it doesn't touch the point, one way or the other.
>
> The Court will sustain the Plaintiffs' Motion in Limine because of the lack of credibility of the tests of alcoholism at the time of the wreck, especially in view

---

**2.** For example, the plaintiffs raised questions with respect to whether the vials used to store the blood samples were sealed and unadulterated before use, whether Ballou's body had been swabbed with alcohol prior to the taking of the blood samples, and whether the samples had been contaminated during extraction of the blood by use of a scalpel that had previously been cleaned in formaldehyde.

of the testimony of Mrs. Eisenhower and the time which the accident occurred. Further, the Court feels to permit it would be prejudicial to the Plaintiffs because it is never possible to judge the attitude of a Jury and how they are affected by the subject of alcohol. Now if it was tried before the Court, it would be a different question, but trying it before the Jury, the Court feels that it would be too harmful and would be extremely prejudicial to the Plaintiff.

After Henri Studios objected to the court's ruling, the court granted it permission to supplement the record for purposes of appeal with additional testimony concerning the blood samples and the blood alcohol test.

During the trial, the plaintiffs introduced the deposition testimony of the ambulance driver and the emergency medical technician (EMT) who transported Ballou's body to the hospital and from the hospital to the funeral home. The EMT testified that Ballou had no perceptible vital signs by the time his body was placed in the ambulance. Both the ambulance driver and the EMT testified that Ballou had been given no drugs, injections, oxygen or anesthetics, and that his body had not been bathed in alcohol or any substance with an alcohol base. The plaintiffs then introduced the deposition testimony of the doctor who examined Ballou in the emergency room of the hospital. The doctor testified that Ballou was dead on arrival at the hospital at 3:00 p. m., and that he was given no drugs or medication at the hospital. The doctor did not know whether Ballou's body was cleaned or swabbed in any manner before it was transported to the funeral home, but he noted that Ballou's hospital records contained no indication that his body had been cleaned.

After the defendant rested its case and outside the presence of the jury, Henri Studios proffered the testimony of the police officer who supervised the taking of the blood samples, the chemist who performed the blood alcohol test, and the mortician who took the blood samples. Officer Frank Coffin, a detective with the Beaumont Police Department, testified that he personally observed the taking of the blood samples from Ballou's body. Coffin testified that before Ballou's blood was extracted, he visually inspected the blood sample vials and determined that the seal on the vials had not been broken. After the blood was extracted and placed in the vials, Coffin labeled the vials with Ballou's name. To insure that the blood in the vials was that of Jesse Ballou, Coffin photographed and took a fingerprint from the body from which the blood had been taken. Later, Coffin located Ballou's fingerprint card among those at the police station, compared it with the print taken from Ballou, and determined that the fingerprints taken from the body matched Ballou's file print. According to Coffin, the blood vials remained in his possession until he locked them in the evidence room at the police station for the evening. Coffin testified that the next morning he personally delivered the same vials of blood to either Bill McClain or Jim Middleton, both of whom were chemists in the crime laboratory, for analysis.

Jim Middleton testified that he was employed by the Beaumont Regional Crime Laboratory as a chemist, and that one of his duties was to perform analyses on various types of evidence brought into the laboratory for subsequent use in litigation. After testifying with respect to his qualifications as an expert, Middleton stated that officer Coffin had personally delivered two vials of blood to him at the crime laboratory on the morning of June 15, 1977. Middleton testified that a laboratory submission form was prepared for the vials, and that the vials were numbered pursuant to departmental procedure. He also stated that the seals on the vials had not been broken at the time they were received, and that the vials had been labeled by officer Coffin with Ballou's name. Middleton testified he locked the vials in a refrigerated box until performing the chemical analysis on the blood on June 24, 1977. He stated that he checked the seals on the vials again before performing the blood alcohol test, and that they were not broken. According to Middleton, the ten-day period of refrigeration of the blood would not affect the results of the blood

alcohol test since the vials contained anti-coagulant and preservative chemicals.

Middleton described in detail the procedures he used in analyzing the blood sample labelled and numbered as Ballou's. He stated that he was familiar with the chemicals and apparatus used, that the chemicals were properly mixed, and that the test was a scientifically accepted method for determining the level of ethyl alcohol in the bloodstream. He testified that in addition to the blood alcohol test, he ran a test to determine if there were any contaminants in the blood sample which could affect the test results, and that the test revealed that there were no such contaminants in the sample. Middleton testified that the results of the blood alcohol test showed that Ballou's blood contained 0.24% ethyl alcohol by weight, with a margin of error of plus or minus 0.01%. He also stated that a person with a blood content of 0.24% is grossly intoxicated, and that such a person could not safely operate a motor vehicle.

Finally, the defendant presented the deposition testimony of the mortician of the funeral home to which Ballou's body was taken from the hospital. The mortician testified that neither he nor the funeral home had kept any record of taking a blood sample from Ballou's body, and that he had no independent recollection of drawing blood from Ballou. Therefore, the mortician testified only as to the procedures he generally utilized in drawing blood samples. According to the mortician, he normally used a dry scalpel to make an incision in a vein from which to draw blood, and that the scalpel was usually cleaned with a solution of formaldehyde and water. The mortician also stated that before taking a blood sample, he generally did not swab the area from which the blood sample would be taken with alcohol or start the embalming procedure. Finally, the mortician testified that although the general practice was for a police officer to bring the sealed vials to the funeral home on the day the blood sample was to be taken, occasionally officers would leave empty, sealed vials at the funeral home and that on such occasions funeral home employees would have access to the vials.

After the defendant proferred this additional evidence, the district court again ruled the results of the blood alcohol test inadmissible.

### 2. Legal Analysis

In reviewing the district court's exclusion of the results of the blood alcohol test, it is important to note at the outset that even though this is a diversity case, the Federal Rules of Evidence govern the admissibility of evidence. *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820 (5th Cir. 1980). Federal law also controls all other procedural matters in diversity cases. *See, e. g., Southern Pacific Transportation Co. v. Smith Material Corp.*, 616 F.2d 111 (5th Cir. 1980).

Under Rule 403 of the Federal Rules of Evidence, a district court may exclude evidence, even if relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice." A trial court's ruling on admissibility under Rule 403's balancing test will not be overturned on appeal absent a clear abuse of discretion. *See, e. g., United States v. Adcock*, 651 F.2d 338, at 343 (5th Cir. 1981); *Ramos v. Liberty Mutual Insurance Co.*, 615 F.2d 334 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981); *Wright v. Hartford Accident & Indemnity Co.*, 580 F.2d 809 (5th Cir. 1978).

Although the district court neither stated with precision the grounds for its decision to exclude the results of the blood alcohol test nor specifically invoked Rule 403, the record clearly reveals that the court excluded the evidence because it believed that its prejudicial potential substantially outweighed its probative value. The court explicitly found that the evidence of Ballou's intoxication "would be too harmful" and "would be extremely prejudicial to the Plaintiff" because "it is never possible to judge the attitude of a Jury and how they are affected by the subject of alcohol." The court's comments also reveal that the court believed that the results of the blood alcohol test lacked "credibility." According to the court, its primary reason for determining that the test results lacked credibility was the testimony of Mrs. Eisenhower

that Ballou was not intoxicated just a few minutes before the collision and Jim Middleton's testimony that it would probably take at least one hour of alcohol consumption to reach a blood alcohol level of 0.24%. But the court's comments also indicate, especially viewed in the context of the immediately preceding argument of counsel, that the court may have characterized the results of the blood test as lacking credibility out of concern that breaks in the "chain of custody" of Ballou's body and the blood samples had occurred or because of the possibility that the samples had been contaminated.

In challenging the district court's exclusion of the results of the blood alcohol test, Henri Studios argues, inter alia, (1) that the court's decision to believe Mrs. Eisenhower's testimony rather than the results of the blood alcohol test constituted a credibility choice which should properly have been reserved for the jury; and (2) that an adequate showing was made with respect to the chain of custody and lack of contamination of Ballou's body and blood samples, and that therefore any evidence concerning possible breaks in the chain of custody or contamination go to the weight and not the admissibility of the evidence. Because we agree with both of these contentions, and in addition conclude as a matter of law that the potential for unfair prejudice of the blood alcohol test did not substantially outweigh its probative value, we hold that the exclusion of the results of the test was an abuse of discretion requiring a reversal of the judgment and a new trial.

■ Henri Studios' argument that the district court made an impermissible credibility choice in deciding to believe Mrs. Eisenhower's testimony rather than the results of the blood alcohol test is well taken. It is clear that the district court credited Mrs. Eisenhower's testimony, and that her statement that Ballou was not intoxicated a few minutes before the collision was the primary basis for the court's decision that the results of the blood alcohol test were not worthy of belief. Of course, since the court found that the test results lacked credibility, they were assigned little or no probative value in the Rule 403 balancing

test, which ultimately led to their exclusion from evidence.

Although we find the court's skepticism about the test results understandable in light of Mrs. Eisenhower's testimony, we cannot sanction the type of credibility choice made by the district court here. Under Fed.R.Evid. 104, a district court is authorized to conduct the balancing test required by Rule 403 outside the presence of the jury, in deciding the preliminary question of the admissibility of evidence. However, we have recently held that "Rule 403 does not permit exclusion of evidence because the judge does not find it credible." *United States v. Thompson*, 615 F.2d 329, 333 (5th Cir. 1980). "Weighing probative value against unfair prejudice under [Rule] 403 means probative value with respect to a material fact *if the evidence is believed, not the degree the court finds it believable.*" *Bowden v. McKenna*, 600 F.2d 282, 284–85 (1st Cir. 1979), *cert. denied*, 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979) (footnote omitted and emphasis added). *See also* 22 C. Wright & K. Graham, Federal Practice & Procedure: Evidence § 5214, at 265–66 (1978). Rather than discounting the probative value of the test results on the basis of its perception of the degree to which the evidence was worthy of belief, the district court should have determined the probative value of the test results *if true*, and weighed that probative value against the danger of unfair prejudice, leaving to the jury the difficult choice of whether to credit the evidence.

■ In our view, the district court also erred in declaring that the test results were not credible (and therefore assigning them little or no probative value) due to concerns regarding possible breaks in the "chain of custody" or contamination of Ballou's body or the blood samples. It is firmly established in this Circuit that the question whether the proponent of evidence has proved an adequate chain of custody goes to the weight rather than the admissibility of the evidence, and is thus reserved for the jury. *United States v. Henderson*, 588 F.2d 157, 160 (5th Cir. 1979), *cert. denied*, 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979); *United States v. White*, 569 F.2d

263, 266 (5th Cir. 1978), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978); *United States v. Ellis*, 547 F.2d 863, 868 (5th Cir. 1977). Likewise, the issue of alteration, contamination or adulteration of the evidence is a question for the jury once the proponent of the evidence makes a threshold showing that reasonable precautions were taken against the risk of alteration, contamination or adulteration. *See United States v. Lane*, 591 F.2d 961 (D.C. Cir.1979); *United States v. Alston*, 460 F.2d 48 (5th Cir. 1972), *cert. denied*, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972). The proponent of the evidence "need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change.... So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in light of the surrounding circumstances." *Lane*, 591 F.2d at 962–63. Under Fed.R.Evid. 901, once the proponent of the evidence meets the threshold requirement of showing that "in reasonable probability the article has not been changed in any important respect from its original condition," *United States v. Albert*, 595 F.2d 283, 290 (5th Cir. 1979), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979), any doubts raised concerning the possibility of alteration or contamination of the evidence go to the weight and not the admissibility of the evidence.

■ Without going into needless detail, we hold that Henri Studios made the necessary threshold showing that reasonable precautions were taken against the risk of alteration or contamination of Ballou's body and the blood samples. It necessarily follows that the court's doubts concerning an adequate "chain of custody" and possible contamination of the blood samples were not appropriate bases for its assignment of low probative value to the evidence.

■ The question remains whether the test results, when properly taken as true, have a potential for unfair prejudice that substantially outweighs their probative value. We hold as a matter of law that the potential for unfair prejudice of the test results does not substantially outweigh their probative value.

The results of the blood alcohol test indicate that Ballou was intoxicated at the time of the collision. Proof of Ballou's intoxication is, of course, highly relevant to and probative of one of the ultimate questions before the jury—Ballou's contributory negligence—and would doubtless have a major effect on the jury's apportionment of fault. On the other hand, in our view the potential prejudice of the test results is comparatively slight. As this court has consistently held, " 'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.' " *Dollar v. Long Manufacturing, N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). *See also Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980); *United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir. 1979), *vacated and remanded on other grounds*, 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980). Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the Advisory Committee on Proposed Federal Rules of Evidence, 28 U.S.C.A. Rule 403 at 102. Although evidence of Ballou's intoxication would surely have an adverse effect on the plaintiffs' case, most of the potential prejudice flowing from the evidence cannot be considered to be unfair since Ballou's intoxication is unquestionably a legitimate ground for a finding of contributory negligence. While there is a slight possibility that evidence of Ballou's intoxication might adversely affect the jury's deliberation on issues other than Ballou's contributory negligence, this slight potential for unfair prejudice is virtually insignificant when compared with the high relevance and probative value of the evidence. We therefore conclude that the district court committed reversible error in excluding the results of the blood test under Rule 403 and that the judgment in favor of Yolanda and Terrence Ballou must

be reversed and the cause remanded for a new trial.

*The Resubmission of the Case to the Jury*

■ Because we reverse the judgment of the district court, it is necessary to address only one of Henri Studios' remaining contentions. As we noted above, although the jury's original general verdict found for the plaintiffs in varying dollar amounts, the jury also found in response to the special interrogatory on apportionment of fault that Henri Studios was 40% negligent and Jesse Ballou 60% contributorily negligent. In view of the fact that Texas law bars the recovery of a plaintiff who is more than 50% negligent, the district court found the general verdict for the plaintiffs to be inconsistent with the finding that Ballou was 60% negligent and, pursuant to Fed.R.Civ.P. 49(b), resubmitted the case to the jury after issuing additional instructions. Henri Studios contends that the district court erred in its determination that the general verdict and special interrogatory were inconsistent, and argues that we should render judgment in its favor based on the special interrogatory finding Ballou 60% contributorily negligent. While recognizing that the general verdict and the answer to the special interrogatory appear to be inconsistent, Henri Studios claims that the contents of a note passed from the jury to the judge during the jury's deliberations, and the judge's response thereto, eliminate the apparent inconsistency and prove the intent of the jury to render a verdict for the defendant. In response to this contention, the plaintiffs correctly point out that Henri Studios failed to object to the court's action in resubmitting the case to the jury and that this argument is raised for the first time on appeal. In light of the absence of a contemporaneous objection to resubmission of the case, and in view of the apparent conflict between the general verdict and special interrogatory, we do not reach the merits of Henri Studios' claim that the court erred in resubmitting the case to the jury and judgment should be based upon the jury's first attempt at a verdict. *Safeway Stores, Inc. v. Dial*, 311 F.2d 595, 599 (5th Cir. 1963). *See also Morrison v. Frito-Lay, Inc.*, 546 F.2d 154, 161 n.10 (5th Cir. 1977); *Landry v. Offshore Logistics, Inc.*, 544 F.2d 757, 761 (5th Cir. 1977); *Turchio v. D/S A/S Den Norske Africa*, 509 F.2d 101, 106 (2d Cir. 1974).

*The Cross-Appeal*

Lula Mae LeBlanc, as administratrix of the estate of Leonard Herman Clay, appeals the jury's verdict finding no damages for Clay's pain and suffering. LeBlanc contends that the jury's failure to award any damages is inconsistent with undisputed evidence of Clay's conscious pain and suffering.

■ Texas substantive law on damages applies in this diversity action. *L. C. L. Theatres, Inc. v. Columbia Pictures Industries, Inc.*, 619 F.2d 455 (5th Cir. 1980). Under Texas law, the plaintiff has the burden of proving that the deceased suffered some conscious pain prior to his death. *Carlisle v. Duncan*, 461 S.W.2d 254 (Tex.Civ. App.—Dallas 1970, no writ); *Canales v. Bank of California*, 316 S.W.2d 314, 318 (Tex.Civ.App.—Eastland 1958, writ ref'd n.r.e.). Our function as an appellate court reviewing the amount of a damage award is limited to ascertaining whether the jury abused its discretion. *Hawkes v. Ayers*, 537 F.2d 836 (5th Cir. 1976).

Under Texas law, "even though the amount of damages is ordinarily left to the discretion of the jury, they cannot ignore the undisputed facts and arbitrarily deny any recovery." *Bazzano v. Ware*, 530 S.W.2d 650, 651 (Tex.Civ.App.—Beaumont 1975, writ ref'd n.r.e.). We applied this rule in *McKinzie v. Fleming*, 588 F.2d 165, 167 (5th Cir. 1979), a diversity case governed by Texas law, in which the jury found that there was an injury but awarded no damages for pain and suffering. We said: "Under Texas law when the undisputed evidence reveals injury with resulting pain and suffering, the jury's answer of '0' damages is considered so against the great weight and preponderance of the evidence to be clearly wrong and manifestly unjust, that reversal is required."

■ This case is readily distinguishable from *Bazzano* and *McKinzie*, for here

the jury did not fail to award damages in the face of undisputed evidence of conscious pain and suffering. Rather, there was conflicting testimony with respect to whether or not Clay suffered conscious pain during the two days between the collision and his death. Dr. Whatley, the emergency room physician, testified that Clay was rendered unconscious on impact and that he was unconscious upon his arrival at the hospital. He also expressed the opinion, based upon reasonable medical probability, that Clay did not regain consciousness prior to his death. Clay's grandmother testified that she saw Clay in the intensive care unit and that he was in terrible pain and was moaning. Clay's father testified that Clay recognized his voice, moved his fingers, and moaned while in intensive care. According to Texas law, evidence of moans and groans alone is insufficient to establish the fact of conscious suffering. *Carlisle*, 461 S.W.2d at 256–57. Under these circumstances, and especially in view of the doctor's testimony that in his medical judgment Clay never regained consciousness, the jury could reasonably have found that Clay never experienced conscious pain and suffering. The jury's refusal to award damages for Clay's pain and suffering must be affirmed.

The judgment against Henri Studios in favor of Yolanda and Terrence Ballou is REVERSED and REMANDED to the district court for a new trial. The judgment awarding no damages for pain and suffering to Lula Mae LeBlanc as administratrix of the estate of Leonard Herman Clay is AFFIRMED.